# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | William J. Hibbler | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 667 | **DATE** | 9/17/2004 |
| **CASE TITLE** | Fidelity vs. Standard Bank & Trust | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's Motion for Summary Judgment (Doc. # 0-1) is GRANTED. Plaintiff's Motion for Summary Judgment (doc. 0-1) is DENIED. Defendant's Motions to strike the 6/02/03 Expert Report of William J. Pollard (doc. # 0-1) are DENIED. Plaintiff's Motion to Sanction Certain Banks (doc. # 0-1) is DENIED. Any and all other pending motions are DENIED as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | **Document Number** |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | SEP 2 0 2004 date docketed | |
| ✓ | Docketing to mail notices. | | |
| ✓ | Mail AO 450 form. | docketing deputy initials | 36 |
| | Copy to judge/magistrate judge. | | |
| JHC | courtroom deputy's initials | date mailed notice | |
| | | mailing deputy initials | |

CLERK, U.S. DISTRICT COURT

2004 SEP 17 PH 3: 29

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| FIDELITY NATIONAL TITLE INSURANCE COMPANY OF NEW YORK, a New York corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| | ) ) ) | Nos. 02 C 643, 02 C 644, 02 C 646, 02 C 647, 02 C 649, 02 C 651, 02 C 667, 02 C 668 |
| v. | ) ) | |
| | ) | The Honorable William J. Hibbler |
| HOWARD SAV. BANK; BANK CALUMET, N.A.; CHARTER BANK & TRUST, N.A.; BRIDGEVIEW BANK & TRUST; FIRST NAT'L BANK OF LAGRANGE; BANK OF HOMEWOOD; STANDARD BANK & TRUST CO.; TCF NAT'L BANK ILL. | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

DOCKETED
SEP 2 0 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Fidelity National Title Insurance Company of New York (Fidelity) sued

nine banks[1] under the Illinois Uniform Fraudulent Transfer Act (UFTA), 740 ILCS § 160/5

*et seq.* alleging that an Illinois title insurer, Intercounty Title Company of Illinois (Old

Intercounty) had fraudulently transferred certificates of deposit in excess of $7 million to

---

[1] Several of the Defendant Banks have changed names since the transactions at issue in this case. For the sake of convenience and clarity, the Court refers to the Defendant Banks only by the names that they now use.

1

the Bank Defendants.[2] The parties have filed cross-motions for summary judgment, as well as numerous other non-dispositive motions.

## I. Factual Background

Laurence Capriotti and Jack Hargrove were principals of Intercounty Title Company of Illinois ("Old Intercounty"). (Def. Banks' Joint 56.1(a)(3) Statement of Facts ¶ 3). Old Intercounty served as the exclusive agent in the Chicago Area for Stewart Title Guaranty Company, a title insurer. (Def. Joint 56.1(a)(3) Statement ¶ 3). Old Intercounty also acted as an escrow agent for real estate transactions. (Def. Joint 56.1(a)(3) Statement ¶ 3). Unfortunately, for all parties involved, Capriotti and Hargrove were not the most trustworthy businessmen.

Because of Capriotti's and Hargrove's malfeasance, Old Intercounty experienced a cash shortage in its accounts that amounted to $17.7 million in 1990 and grew to $96 million by 1999. (Pl. 56.1(a)(3) Statement ¶ 17; Def. Joint 56.1(a)(3) Statement ¶ 1999). This is where the parties' agreement as to the facts end and the parties dispute the remaining course of events. Principal among these disputes are the nature of the accounts where the shortfall occurred and the time at which Fidelity discovered the scheme. According to Fidelity, Capriotti and Hargrove pillaged Old Intercounty's escrow accounts and used escrow funds entrusted to Old Intercounty to purchase certificates of deposit at the Defendant Banks. Fidelity states that Capriotti and Hargrove then pledged these

---

[2] One of the banks, Westbank, has reached settlement with the Plaintiff and is no longer a party to this suit.

certificates as collateral for personal loans. According to the Banks, the accounts from which Fidelity transferred money for the purchase of certificates of deposit contained more than just escrow funds. In any event, much of the dispute between the parties is not material to the resolution of the pending motions, and the Court finds the following facts to be undisputed.

A.   *The Transactions at Issue*

1.   Bank Calumet

On December 23, 1991, Old Intercounty wired $175,000 from an account at LaSalle National Bank to Bank Calumet in order to purchase a certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 48). Bank Calumet points to no measures it took to ascertain whether the certificate of deposit was purchased with funds from Old Intercounty's escrow account. (Pl. 56.1(a)(3) Statement ¶ 48). Ten months later, Capriotti and Hargrove received a $175,000 loan from Bank Calumet, the proceeds of which they used to payoff a loan obtained by James Burke, another Intercounty insider, in December 1991. (Pl. 56.1(a)(3) Statement ¶ 51, Pl. Ex. Azzarello DE 12). As collateral for the loan, Capriotti and Hargrove pledged the certificate of deposit obtained from Bank Calumet in December 1991. (Pl. 56.1(a)(3) Statement ¶¶ 52-54). On March 24, 1993, Capriotti and Hargrove directed Bank Calumet to liquidate the certificate of deposit and applied $149,951.50 of the proceeds to pay off Capriotti's and Hargrove's loan. (Pl. 56.1(a)(3) Statement ¶ 55).[3]  Bank Calumet

---

[3] In many of the transactions at issue, including this one, the original certificates of deposit purchased by Old Intercounty had matured and been rolled over into new certificates of deposit and pledged again as collateral for Capriotti's and Hargrove's loans. *See, e.g.*, Pl.

issued Capriotti a cashier's check for $25,048.50 (representing the balance of the pledged certificate of deposit), which Capriotti endorsed and transferred to Capjac Investments Group, Inc., a real estate investment company that he and Hargrove owned. (Pl. 56.1(a)(3) Statement ¶¶ 56-58).

## 2. Charter Bank

On March 7, 1990, Old Intercounty wired $1,000,000 from an account in order to purchase a $1,000,000 certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 77-78). On March 8, 1990, Hargrove and Capriotti obtained a loan from Charter Bank in the amount of $1,000,000, pledging the certificate of deposit as collateral. (Pl. 56.1(a)(3) Statement 79-80). Old Intercounty renewed the certificate of deposit in 1991, 1992, 1993, 1994, and 1995 and after each renewal re-pledged the certificate as collateral for the original $1,000,000 loan to Capriotti and Hargrove. (Pl. 56.1(a)(3) Statement ¶¶ 87-88).

In 1993, however, Charter Bank requested an opinion from Old Intercounty's counsel verifying that Hargrove and Capriotti could pledge the certificate of deposit as collateral for their loan even though it belonged to Old Intercounty. (Pl. 56.1(a)(3) Statement ¶ 92). Old Intercounty's counsel sent Charter Bank a letter stating that Old Intercounty's by-laws allowed it to hypothecate the certificate of deposit for the benefit of Capriotti and Hargrove and that Old Intercounty had taken all the appropriate actions to allow Capriotti and Hargrove to use the certificate of deposit as collateral for their loan.

---

56.1(a)(3) Statement ¶¶ 53-54. The Court finds it unnecessary to repeat, for each transaction, the details concerning the maturation and repledging of each certificate.

4

(Def. Charter Bank's 56.1(b)(3)(B) Statement of Additional Facts ¶ 5). In 1996, Capriotti directed Charter Bank to pay off the loan using the $1,000,000 certificate of deposit, which Charter Bank did. (Pl. 56.1(a)(3) Statement Ex. Altenberger DE 17, 19). Despite the fact that Capriotti and Hargrove had used the certificate to pay off the loan, Old Intercounty listed the certificate on its monthly escrow bank reconciliations statements until January 2000. (Pl. 56.1(a)(3) Statement ¶ 99).

3.    Homewood Bank

In January 1990, Old Intercounty wired $750,000 from an account at American National Bank & Trust Company of Chicago to Homewood Bank. (Pl. 56.1(a)(3) Statement ¶ 101). Later that month, Homewood Bank issued a certificate of deposit in the amount of $750,000 to Old Intercounty. (Pl. 56.1(a)(3) Statement ¶102). And Old Intercounty then executed a Power to Hypothecate the certificate, thus allowing it to be pledged as collateral for a loan to Capriotti and Hargrove. (Pl. 56.1(a)(3) Statement ¶ 103). Approximately one month later, Capriotti and Hargrove obtained a personal loan from Homewood Bank for $750,000 and pledged Old Intercounty's certificate of deposit as collateral. (Pl. 56.1(a)(3) Statement ¶ 104-105).

Shortly after approving the loan, the Bank of Homewood requested, among other things, an opinion from Old Intercounty's counsel "affirming that the pledge of the CD is a valid and binding obligation of Intercounty." (Def. 56.1(a)(3) Statement Ex. 24). Counsel for Old Intercounty, Joseph Planera, wrote the Bank of Homewood in March 1991 and affirmed that "there appears to be no restrictions . . .relative to the specific certificate of

deposit, issued in the name of Intercounty Title Company of Illinois . . . as it relates to the hypothecation of the principal sum of . . . $750,000 for a loan to Jack L. Hargrove and Laurence W. Capriotti." (Def. 56.1(a)(3) Statement Ex. 24). Old Intercounty's counsel also supplied the Bank of Homewood with a corporate resolution authorizing it to hypothecate the certificate of deposit. (Def. 56.1(a)(3) Statement Ex. 24).

In January 1993, when renewing Capriotti's and Hargrove's loan, the Bank requested that Old Intercounty verify in writing that the funds to purchase the certificate of deposit were not escrowed funds. (Def. 56.1(a)(3) Statement Ex. 24). On March 19, 1993, Susan Peloza, Old Intercounty's Secretary, informed the Bank of Homewood that "the certificate of deposit is not escrowed funds, but unrestricted funds of Intercounty Title." (Def. 56.1(a)(3) Statement Ex. 24). In March 1996, Homewood Bank liquidated the certificate of deposit to pay off the $750,000 loan. (Pl. 56.1(a)(3) Statement ¶ 116). Again, despite the liquidation of the certificate, Old Intercounty listed the $750,000 certificate on its escrow bank reconciliations until December 1992. (Pl. 56.1(a)(3) Statement ¶ 120).

4.   Howard Bank

In February 1990, Old Intercounty purchased a certificate of deposit in the amount of $1,000,000 from Howard Bank. (Pl. 56.1(a)(3) Statement ¶ 122). The check drafted by Old Intercounty to purchase the certificate identified the account from which the funds came as an escrow account. (Pl. 56.1(a)(3) Statement ¶ 123, Ex. Podromos DE 2). At the same time as Old Intercounty purchased the certificate of deposit, Capriotti and Hargrove obtained a $1,000,000 loan from Howard Bank, pledging the Old Intercounty certificate of

deposit as collateral. (Pl. 56.1(a)(3) Statement ¶¶ 127-128). Capriotti and Hargrove signed an affidavit in which they averred that the loan from Howard Bank was for business purposes only. (Def. 56.1(b)(3)(B) Statement Ex. 7). Several months after Howard Bank issued the loan, Old Intercounty executed a Power to Hypothecate the certificate of deposit that it had pledged as collateral. (Pl. 56.1(a)(3) Statement ¶ 132). And in 1995, the certificate of deposit securing the loan was liquidated to pay off the February 1990 loan. (Pl. 56.1(a)(3) Statement ¶ 136).

Old Intercounty also purchased a second $1,000,000 certificate of deposit from Howard Bank in July 1990. (Pl. 56.1(a)(3) Statement ¶¶142-143). To purchase the second $1,000,000 certificate of deposit, Old Intercounty drafted a check with the label "Title Indemnity Account." (Pl. 56.1(a)(3) Statement ¶ 144, Ex. Podromos DE 22). The same day, Capriotti and Hargrove obtained a second $1,000,000 loan from Howard Bank. (Pl. 56.1(a)(3) Statement ¶ 146). Capriotti and Hargrove once again signed an affidavit averring that the loan was to be used for business purposes only. (Def. 56.1(b)(3)(B) Statement Ex. 9). And, as in the previous transactions, Capriotti and Hargrove pledged Old Intercounty's certificate of deposit as collateral for their loan. (Pl. 56.1(a)(3) Statement ¶ 147). The July 1990 Howard Bank loan was also paid off in 1995 when Howard Bank liquidated the certificate of deposit pledged as collateral. (Pl. 56.1(a)(3) Statement ¶¶ 152-153).

5.    LaGrange Bank

In March 1991, Old Intercounty wired LaGrange Bank $900,000 in order to purchase a certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 158). One day after Old Intercounty purchased the certificate, LaGrange Bank loaned Capriotti and Hargrove $900,000. (Pl. 56.1(a)(3) Statement ¶ 160). The certificate of deposit purchased by Old Intercounty was pledged as collateral for the loan. (Pl. 56.1(a)(3) Statement ¶ 161). Prior to issuing the loan, however, LaGrange Bank required Old Intercounty to pass a corporate resolution approving the hypothecation of the certificate of deposit for the loan to Capriotti and Hargrove. (Def. LaGrange Bank 56.1(a)(3) Statement ¶ 8). Old Intercounty did so, and its legal counsel also sent the Bank a letter affirming that the funds used by Old Intercounty to purchase the certificate of deposit were "funds owned by Intercounty Title Company of Illinois . . . [with] no restrictions on the pledging of said funds." (Def. LaGrange Bank 56.1(a)(3) Statement Ex. 7). Finally, Old Intercounty also delivered to the Bank a Power to Hypothecate, representing that Old Intercounty consented to the use of their certificate of deposit as collateral for Capriotti's and Hargrove's loan. (Def. LaGrange Bank 56. 1(a)(3) Statement Ex. 5).

In December 1991, the certificate of deposit matured and the proceeds were invested into a new certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 163). At the same time, the proceeds of the second certificate of deposit were used to pay off the $900,000 loan to Capriotti and Hargrove. (Pl. 56.1(a)(3) Statement ¶ 164; Pl. 56.1(a)(3) Statement Ex. 12 ¶¶ 37-38; Pl. 56.1(a)(3) Statement Haley Dep. at 29). Old Intercounty nevertheless listed a

$900,000 certificate of deposit on its escrow bank reconciliation statements from March 1991 until January 2000. (Pl. 56.1(a)(3) Statement ¶ 166).

6.    Standard Bank

In September 1990, Old Intercounty wired $900,000 from an account at Exchange National Bank of Chicago to Standard Bank to purchase a certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 167). In a now all to familiar fashion, Capriotti and Hargrove then used Old Intercounty's certificate of deposit as collateral to secure a $900,000 loan. (Pl. 56.1(a)(3) Statement ¶¶ 168-69). Prior to receiving the loan, Capriotti, as President of Old Intercounty, signed a "Collateral Agreement" with Standard Bank, which among other things asserted that Old Intercounty was the "lawful owner of the Collateral" and that it had the power to pledge the certificate of deposit as collateral. (Def. 56.1(a)(3) Statement Ex. 30 at SBT 190). In addition, Allen Brown, acting as counsel for Old Intercounty, wrote Standard Bank a letter in which he repeated Capriotti's assurances, stating that the use of the certificate as collateral had been authorized by the corporation and that pledging the certificate did not violate any laws. (Def. 56.1(a)(3) Statement Ex. 30 at SBT 279). Ultimately, Old Intercounty redeemed the certificate of deposit and used the proceeds to pay off the loan to Capriotti and Hargrove. (Pl. 56.1(a)(3) Statement ¶¶ 175-176; Def. 56.1(a)(3) Statement Ex. 30 at SBT 390). Old Intercounty continued to list the certificate of deposit purchased from Standard Bank on its escrow bank reconciliations until January 2000. (Pl. 56.1(a)(3) Statement ¶ 178).

7.    TCF Bank

On September 1, 1988, Garfield Ridge Trust and Savings Bank[4] issued a certificate of deposit in the amount of $250,000 to Susan Peloza, Old Intercounty's Secretary. (Pl. 56.1(a)(3) Statement ¶ 180). Shortly thereafter Peloza obtained a $250,000 loan from Garfield Bank, and pledged the earlier-obtained certificate of deposit as collateral. (Pl. 56.1(a)(3) Statement ¶ 183-84). The proceeds of the loan were used by Peloza to remodel and landscape her home, which upon completion would be rented to Old Intercounty to use for business functions. (Pl. 56.1(a)(3) Statement ¶ 187). In May 1992, Old Intercounty, serving as Peloza's escrow agent, received a check from Chicago Heights National Bank in the amount of $786,101.67 and used those funds to pay off the balances of Peloza's original $550,000 mortgage and also the 1988 $250,000 loan from Garfield Bank. (Pl. 56.1(a)(3) Statement Ex. Doering DE 10, 12; Def. TCF Bank 56.1(b)(3)(B) Statement Ex. B). Shortly after the loan from Garfield Bank was paid off, Garfield Bank informed Peloza that it transferred the certificate of deposit to its "Safekeeping file" until its maturity. (Def. Banks 56.1(a)(3) Statement Ex. 26B at 000072). When TCF acquired Garfield Bank in 1997, there was no record of the certificate of deposit as being in existence or as an active account. (Doering Dep. at 118).[5]

---

[4] TCF Bank is a successor to Garfield Ridge Trust and Savings Bank. (Pl. 56.1(a)(3) Statement ¶ 9). In its statement of facts, Fidelity repeatedly refers to the transactions at issue as involving TCF Bank, not Garfield Bank, causing TCF to dispute every statement of fact.

[5] Fidelity also alleges that Old Intercounty purchased two additional certificates ($100,000 and $75,000) that it used as collateral to secure a $175,000 loan from TCF Bank (or its predecessor in interest) to Homeland Mortgage Corporation. TCF Bank disputes these facts. The dispute, however, is not material for the purposes of this opinion.

8.  Westbank

In March 1989, Old Intercounty transferred $306,125 to Westbank from an account at Exchange National Bank in order to purchase a certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 202). During the same month, Westbank then issued a loan to Chartwell Financial Corporation in the amount of $306,125. (Pl. 56.1(a)(3) Statement ¶ 203). The loan to Chartwell was secured by Old Intercounty's certificate of deposit. (Pl. 56.1(a)(3) Statement ¶ 204). In November 1989, the name on the loan was changed to Madison Avenue Investments, a company owned by Hargrove. (Pl. 56.1(a)(3) Statement ¶ 206; Def. Banks 56.1(a)(3) Statement Ex. 25M). In December 1990, the certificate of deposit serving as collateral for the loan to Madison Avenue Investments was liquidated to pay off the loan. (Pl. 56.1(a)(3) Statement ¶ 210). And after the certificate was liquidated, Old Intercounty continued to list the certificate on its escrow bank reconciliation statements until January 2000. (Pl. 56.1(a)(3) Statement ¶ 212).

B.  *New Intercounty, INTIC and Fidelity*

In 1995, the business relationship between Stewart and Old Intercounty had soured and Capriotti and Hargrove desired a new underwriter. (Def. 56.1(a)(3) Statement ¶5, Simonton Dep. at 35-37). As a result, Intercounty Title Company ("New Intercounty") and Intercounty National Title Insurance Company ("INTIC") were formed. (Pollard Dep. at 393; Thyfault Dep. at 95). Susan Peloza and Terry Cornell, both former officers of Old Intercounty, owned New Intercounty. (Pollard Dep. at 393). At the same time, Capriotti

and Hargrove also formed ITI Enterprises to manage and control New Intercounty's escrow accounts. (Def. 56.1(a)(3) Statement ¶ 11).

ITI Enterprises assumed control over the employees and assets of Old Intercounty, whereby former Old Intercounty employees became ITI Enterprises employees. (Thyfault Dep. at 28-29). New Intercounty became the exclusive agent of INTIC for issuing title insurance policies in Illinois and also acted as an escrow agent, holding funds in trust for various real estate transactions. (Def. 56.1(a)(3) Statement ¶¶ 6-10). INTIC, which served as the underwriter for New Intercounty, issued closing protection letters under which it indemnified parties to the escrow against loss in connection with closing activity. (Def. 56.1(a)(3) Statement ¶¶ 12-13; Thyfault Dep. at 94-95).

According to Fidelity, Old and New Intercounty manipulated their books during a three-month period between November 1995 and January 1996 in order to transfer nearly $30 million in cash shortages in Old Intercounty's escrow accounts (likely created in large part because of Capriotti's and Hargrove's schemes, some of which were previously described) to New Intercounty's escrow accounts. (Pollard Rep. at 47-48).[6]

---

[6] Defendant Banks dispute Pollard's finding, claiming that "Pollard's opinion is not supported by citation to foundational facts nor does it explain how a 'shortage' in one account can be 'transferred' to another." The Court agrees in part. Pollard's report directs the Court to "Attachments C-24, C-25." No such attachments, however, are appended to the report. Although Pollard specifies the documents that he reviews, the Court is unable to assess these documents because they are not attached to the report. Contrary to the Banks' argument that Pollard does not explain how a shortage can be transferred from one account to another, however, the Court finds that he has done so. According to Pollard, escrow deposits were made into Old Intercounty's account, while corresponding withdrawals were made from New Intercounty's account — thus resulting in a net transfer in favor of Old Intercounty and against New Intercounty. Pollard also explained that sometimes New Intercounty simply directly

As the new corporations formed, Capriotti and Hargrove also sought to obtain a reinsurance agreement. William Craig, Old Intercounty's Chief Operating Officer, contacted Thomas Simonton (who then was employed by Commonwealth Land Title Insurance Company). (Def. 56.1(a)(3) Statement ¶ 16). Simonton met with Capriotti, Hargrove and other New Intercounty officers shortly thereafter. (Def. 56.1(a)(3) Statement ¶¶ 36-28). In September 1995, Simonton joined Fidelity. (Def. 56.1(a)(3) Statement ¶ 26). Simonton's arrival at Fidelity was fortuitous because Fidelity desired to bolster its market share in the Midwest and Simonton brought New Intercounty's potential business with him to Fidelity. (Def. Joint 56.1(a)(3) Statement ¶ 25; Simonton Dep. at 38-39). And so on September 14, 1995, Simonton signed on behalf of Fidelity a reinsurance agreement with INTIC. (Def. Joint 56.1(a)(3) Statement ¶ 27; Simonton Dep. at 39-41).

The agreement signed by Fidelity and INTIC was a form agreement that had been modified by Simonton and a colleague to fit the parties' needs. (Def. Joint 56.1(a)(3) Statement ¶ 22). Under the reinsurance agreement, Fidelity and INTEC agreed that Fidelity would automatically reinsure INTIC against loss sustained on its title policies in excess of INTIC's primary retention. (Pl. 56.1(a)(3) Statement ¶¶ 21-22; Def. Joint 56.1(a)(3) Statement ¶¶ 28-30). Because INTIC was a new underwriter, the reinsurance agreement between INTIC and Fidelity allowed INTIC to request Fidelity's joinder on the insured closing letters it issued to indemnify New Intercounty customers against loss in connection

---

transferred funds to Old Intercounty's accounts.

with escrow closing activity. (Pl. 56.1(a)(3) Statement ¶ 25; Def. 56.1(a)(3) Statement ¶ 30; Def. 56.1(a)(3) Statement Ex. 1 at 5-6; Simonton Dep. at 42).

After signing the reinsurance agreement, Simonton provided INTIC via facsimile a form insured closing letter bearing his signature. (Def. 56.1(a)(3) Statement ¶ 33). Simonton never inquired whether INTIC was joining Fidelity on any insured closing letters and assumed instead that because the reinsurance agreement required INTIC to make a request to join Fidelity on the closing letters that he would be notified if INTIC did in fact join Fidelity on the letters. (Def. 56.1(a)(3) Statement ¶ 52). In fact, according to Simonton, the provision to allow INTIC to issue joint closing protection letters was just a "thrown-in" because he believed that INTIC would not need the provision after the first few months of operation. (Simonton Dep. at 44-45). But although INTIC never made any such requests, it nevertheless joined Fidelity on every transaction it underwrote. (Def. 56.1(a)(3) Statement ¶ 30; Simonton Dep. at 54-55, 90-91; Maudsley Dep. at 93). And until April 2000, Simonton remained unaware that INTIC was issuing joint insured closing letters. (Pl. 56.1(a)(3) Statement ¶ 26; Def. 56.1(a)(3) Statement ¶ 56)[7].

_____

[7] It should be noted that Plaintiff's Paragraph 26 and Defendants' Paragraph 56 are virtually identical. And yet Defendants curiously and obstinately dispute Plaintiff's Paragraph 26. But in that dispute Defendants do not point to any evidence that directly refutes the fact presented — that Fidelity (or Simonton) was unaware that INTIC was issuing joint insured closing letters until April 2000. Instead, Defendants present evidence that shows that Fidelity was aware that "insured closing letters were contemplated with its reinsurance of INTIC." Whether the letters were contemplated sheds no light on whether Fidelity (or Simonton) was aware that the letters were *in fact* being used. Thus, the Defendants point to no evidence to place the fact presented by the Plaintiff in dispute. The local rules for summary judgment are designed to streamline the process, pointing the judge to the averments that are in dispute and the record evidence to support that dispute — not to force the judge to wade through a virtual quagmire of

### C. Fidelity Discovers Escrow Shortages

In February or March 2000, Simonton discovered that there may have been a shortage in New Intercounty's escrow accounts. (Pl. 56.1(a)(3) Statement ¶ 27). Although Fidelity had a standard audit program, it was not designed for use with a reinsurance agreement and thus had not monitored INTIC's accounts. (Hunsinger Dep. at 13-15). In April 2000, Simonton wrote a memorandum to his supervisor, Ronald Maudsley, claiming that he had sent Fidelity employees to "look at INTIC policy recording procedures and escrow practices," in an effort to deflect blame from himself for any liability resulting from the INTIC deal. (Def. 56.1(a)(3) Statement ¶¶ 50-51; Simonton Dep. at 113).

In March and April 2000, Michael Gallaher, Fidelity's Agency Audit Director and Manager, began to investigate the extent of the New Intercounty's escrow shortage. (Pl. 56.1(b)(3)(B) Statement ¶ 48). As part of the investigation, Paul Hunsinger, a Fidelity Audit Manager, went to New Intercounty to perform an escrow account analysis to determine whether New Intercounty did, in fact, have an cash shortage in its escrow account. (Hunsinger Dep. at 110-112).[8] Hunsinger learned, among other things, that New

---

paper hunting for a dispute. *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 921-22 (7th Cir. 1994). This is but one example of numerous "disputed" facts that are not truly in dispute. Judging from the "disputes" in the parties' statements of facts, all parties seem to be of the mindset that any fact presented by their opponent cannot possibly be left undisputed. All parties are encouraged to avoid knee-jerk, "dispute-everything" reactions to the opposing party's statement of facts and to reserve disputes for those facts where they can point to evidence that actually refutes the opposing party's fact.

[8] While performing the analysis, Hunsinger discovered that New Intercounty's escrow account was controlled by ITI Enterprises, a fact which until that point Fidelity

Intercounty's escrow account at Harris Bank had not been reconciled. (Def. 56.1(a) Statement ¶ 81). Thus, Hunsinger and the auditors determined New Intercounty's escrow shortage primarily by comparing the outstanding checks against the current bank balances. (Def. 56.1(a) Statement Ex. 3). By April 2000, Hunsinger had discovered that the shortages in the escrow accounts was approximately $45 million. (Hunsinger Dep. at 123-125). Later in April 2000, Gallaher prepared a report explaining the audit team's analysis of New Intercounty's escrow account estimating New Intercounty's escrow shortage to be in excess of $55 million. (Def. 56.1(a) Statement Ex. 3). After the discovery of the extent of the escrow shortage, Fidelity began to monitor New Intercounty's escrow account to ensure that escrow funds were properly disbursed. (Pl. 56.1(b)(3)(B) Statement ¶ 71).

At some point during this process, Gallaher received several pages of handwritten notes listing various banks and certificates of deposit and controlled disbursement accounts at those banks. (Def. 56.1(a) Statement Ex. 4).[9] Among the certificates listed in the notes

_____

was apparently unaware. (Hunsinger Dep. at 114).

[9] Fidelity objects that the notes are unauthenticated and hearsay, pointing to Gallaher's affidavit in which he claims that he does not know who provided him with the notes. But Gallaher's affidavit therefore implicitly admits that he did review the notes and that he did forward them to Simonton. The notes put Gallaher, Simonton and Fidelity on notice of the information contained within them. Furthermore, the Banks do not use the notes to prove that the information contained within is true (i.e. that Account #103694707 at Charter National Bank was closed). The Banks use the notes to show the effect on the listener — that Gallaher, Simonton, and Fidelity were told that Account #103694707 at Charter National Bank was closed. For that purpose, the notes are not hearsay at all.

Fidelity also objects to the fact that the notes are misleading, claiming that the abbreviation "CD" used to in the notes meant "controlled disbursement accounts." But in at least one instance, as noted above, the "CD" referred to one of the certificates of deposit that was part of a transaction at issue in this case.

was the certificate used by Capriotti and Hargrove to obtain the loan from Charter National Bank. (Def. 56.1(a) Statement Ex. 4). Gallaher sent these notes to Simonton via facsimile on May 15, 2000. (Def. 56.1(a) Statement Ex. 4). Fidelity's investigative efforts to this point were to determine the size of the escrow deficiency, to identify any assets that existed to offset it, and to ensure that current funds were properly disbursed. (Def. 56.1(a) Statement ¶ 88; Pl. 56.1(b)(3)(B) Statement ¶ 71).

As Fidelity continued its investigation, it began to look deeper into the Intercounty records in order to determine its own liability as well as whether the escrow shortage might have been caused by wrongdoing. Hunsinger had become concerned that the reinsurance agreement with INTIC may obligated Fidelity for some part of the escrow shortage. (Hunsinger Dep. at 125). Consequently, Fidelity, through its counsel, hired Deloitte & Touche to investigate the "potential inappropriate financial transactions surrounding escrow accounts of Intercounty National Title Insurance Company [Old Intercounty]." (Pollard DE 9).[10] In June 2000, William Pollard, a Senior Manager in the

---

[10] Pollard prepared an expert report. But the Banks argue that Pollard selectively destroyed evidence that cast doubt on his report and that as a sanction Fidelity's references to Pollard's report should be stricken. The Banks' argument is unconvincing. First, the Banks misread the Pollard's deposition testimony. Although Pollard might have discarded handwritten notes taken during a meeting with Stimac, Fidelity did produce the typed version of these notes. Further, when deposed, Pollard also testified that some various work papers were discarded. The Banks seize upon a careless response to the question "So work that you did which would not support your working theory you destroyed?" to which Pollard answered affirmatively. But Pollard clarifies his response immediately, explaining that he and other Deloitte employees on his team would investigate many different leads to find the various ways in which Capriotti and Hargrove siphoned money from the escrow accounts and that the team would discard notes on leads that turned out to be fruitless. In addition, the Banks themselves rely heavily on Pollard's report, citing it in many of their own statements of fact. The Court finds that while Pollard's

Forensic Accounting Department at Deloitte & Touche, produced a report for Fidelity in which he informed Fidelity that he suspected that New Intercounty's escrow shortages had been caused by a variety of inappropriate transfers. (Pollard DE 29).

After reviewing Pollard's June 2000 report, Fidelity informed INTIC that it was terminating that Automatic Reinsurance Agreement, under which INTIC had been issuing joint insured closing letters. (Pl. 56.1(a)(3) Statement ¶ 30). That same day, the Illinois Department of Financial Institutions (DFI) issued a Cease and Desist Order against INTIC, directing it to stop issuing title insurance policies. (Pl. 56.1(a)(3) Statement ¶ 31). A few days later, the DFI appointed Fidelity as trustee of INTIC to insure the proper disbursement of escrow funds held by INTIC and its agents. (Pl. 56.1(a)(3) Statement ¶ 32). And in late summer 2000, Pollard met with an FBI agent and Mark Lischka, an IRS Special Agent, who were also investigating the Intercounty insiders. (Def. 56.1(a)(3) Statement ¶ 111).[11] Over the course of the next year, Fidelity paid nearly $37 million in escrow claims

---

quick-to-discard policy may have been careless, it does not warrant the exclusion of his report, particularly since Defendants rely on it to present their own motions. Defendants' motion to strike is DENIED.

[11] In June 2003, the Banks moved to compel discovery of communications between Fidelity and its agents and the Government. In their motion, the Banks asserted that Fidelity had supplied information to the Government that led to a grand jury investigation, which now turns out to be false. Fidelity moves for sanctions against the Banks, arguing that it made a false representation to the Court and thus caused Fidelity to waste time on the discovery motion that it otherwise would not have had to spend. But the context of the motion, and the argument before Judge Castillo makes clear that: (1) the Banks sought information that might lead to material relevant to their statute of limitations argument; (2) Fidelity had been objecting to providing the information on grounds of relevancy; (3) Fidelity informed Judge Castillo that it had supplied no information to the Government to cause it to begin a grand jury investigation; and (4) the Banks made clear that they believed Fidelity's communications with the Government might contain discoverable information. Judge Castillo agreed, stating that he was "dismayed at some of the

in accordance with its obligations under the terms of the reinsurance agreement with INTIC. (Oates Dep. at 111-12; Partington Dep. at 184-186; Partington DE 6, 10).

Meanwhile, Pollard's investigation into Old and New Intercounty's scheme continued. Pollard gradually uncovered Capriotti's and Hargrove's scheme to pillage Intercounty's (both Old and New) escrow accounts, a scheme that resulted in ever-increasing escrow shortage in those escrow accounts. (Def. 56.1(a)(3) Statement ¶ 57). Pollard prepared weekly or biweekly status reports informing Fidelity of Deloitte's investigation. (Def. 56.1(a) Statement ¶ 102). For eight weeks, Deloitte and Fidelity had access to a warehouse where New Intercounty, Old Intercounty, and ITI Enterprises stored their records. (Def. 56.1(a) Statement ¶ 104; Pl. 56.1(b)(3)(B) Statement ¶¶ 120-121). But both the volume and haphazard arrangement of the documents stored within the warehouse made Fidelity's review of the records difficult. (Pl. 56.1(b)(3)(B) Statement ¶¶ 120-126).

Eventually, Pollard learned that by 1996, the cash shortage in the escrow accounts was $66.9 million. (Def. 56.1(a)(3) Statement ¶ 58). The shortage reached $ 77.8 million by 1997. (Def. 56.1(a)(3) Statement ¶ 61). And by 1999, it had reached $96.4 million. (Def. 56.1(a)(3) Statement ¶ 67). Fidelity sued INTIC, New Intercounty, Capriotti and Hargrove,

---

things that haven't been turned over," and reminding both parties that "what is discoverable is much broader than what is ultimately admissible as a proper and legal defense." While the Banks might have overstated their case in pressing for this discovery, the material certainly was discoverable (and Fidelity was resisting its discovery on relevancy and overbreadth grounds) and the transcript makes clear that Judge Castillo was not misled by the Banks' overstatement. Fidelity's motion for sanctions is DENIED.

and other insiders in September 2000, alleging among other things that "monies that were deposited in escrow by thousands of unsuspecting customers of Intercounty Title Company . . . were systematically stolen . . . and used for improper purposes." (Def. 56.1(a)(3) Statement ¶ 112). Sometime before December 2000, Fidelity learned that Banco Popular had used a certificate of deposit that had served as INTIC's statutory bond to satisfy personal obligations of Peloza and Cornell. (Def. 56.1(a)(3) Statement ¶¶ 112-113; Pl. 56.1(b)(3)(B) Statement ¶¶ 155-164).

D.    *Fidelity Learns of Capriotti's and Hargrove's Scheme*

Around the same time as Fidelity initiated the Banco Popular lawsuit, its counsel interviewed George Stimac, the former controller of ITI Enterprises. (Def. 56.1(a) Statement ¶ 117; Pl. 56.1(b)(3)(B) Statement ¶ 175). Among other things, Stimac shared with counsel the "office scuttlebutt" that Intercounty insiders had pledged certificates of deposit purchased with escrow funds for personal loans. (Lepinskas Dep. at 48, 61). Stimac, however, had no personal knowledge of the scheme and could not provide counsel with the names of any banks where the certificates of deposit were held. (Lepinskas Dep. at 61). Counsel for Fidelity then arranged for Pollard to speak with Stimac. (Pl. 56.1(b)(3)(B) Statement ¶ 178).

Deloitte's status report for the Week of December 11, 2000 indicates that for the upcoming week of December 18 Deloitte would begin "an investigation into potential investments in Certificates of Deposit." (Def. 56.1(a) Statement Ex. 5). Pollard had reason to take Stimac's allegations seriously because on December 8, 2000, Pollard had received

a letter from the IRS Agent Lischka asking Pollard to supply him with "any evidence, documentation or files pertaining to Certificates of Deposit purchased with escrow funds." (Def. 56.1(a)(3) Statement Ex. 6; Def. 56.1(a)(3) Statement ¶ 144). Pollard then met with Stimac on December 26, 2000. (Pl. 56.1(b)(3)(B) Statement ¶ 178). According to Pollard, Stimac was the first person with knowledge of Old Intercounty's accounting practices who agreed to cooperate with Fidelity's and Deloitte's investigation. (Pl. 56.1(b)(3)(B) Statement ¶ 179). Stimac suggested that Pollard examine Old Intercounty's escrow reconciliations, which listed certificates of deposit that had been purchased with escrow funds as investments. (Pl. 56.1(b)(3)(B) Statement ¶ 183).

Based on the information provided by Stimac, Deloitte first examined Old Intercounty's bank reconciliations. (Def. 56.1(a) Statement ¶ 152). When Pollard examined these reconciliations, he complied a list of 51 certificates of deposit held at various banks that might have been used by Capriotti and Hargrove in their scheme. (Def. 56.1(a) Statement ¶¶ 154, 158; Ex. 11). Fidelity subpoenaed various banks to determine at which banks Capriotti and Hargrove may have perpetrated their scheme. (Lepinskas Dep. at 152-156). The subpoenas requested information regarding certificates of deposit that had been pledged for the personal use of Intercounty insiders. (Def. 56.1(a) Statement ¶ 127).

On January 22, 2001, Ronald Lepinskas, counsel for Fidelity, prepared a memorandum for Fidelity's lead counsel in the Intercounty matters, explaining the results of his and Pollard's investigation into the escrow defalcation. (Def. 56.1(a) Statement Ex. 12). In that memo, Lepinskas explains that he had "identified many various banks where

CD's may possibly have been kept and later converted" and that "these banks [had been] served with subpoenas, and [we] are currently awaiting records." (Def. 56.1(a) Statement Ex. 12). On January 26, 2001, IRS Special Agent Lischka sent Deloitte a schedule he had prepared summarizing various certificates of deposit purchased by Old Intercounty. (Pl. 56.1(b)(3)(B) Statement ¶ 203).

Fidelity filed these suits on January 25, 2002.

## II. Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In a summary judgment action, the moving party shoulders the initial burden of production. It must identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (quoting Fed.R.Civ.P. 56(c)). When the movant satisfies that burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "If no genuine issue of material fact exists, the sole question is whether the moving party is entitled to judgment as a matter of law." *Santaella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir.1997). In considering cross-motions for summary judgment, the Court must construe all inferences in favor of

the party against whom the motion under consideration is made. *Allen v. City of Chi.*, 351 F.3d 306, 311 (7th Cir.2003).

## III. Analysis

The Defendant Banks first argue that they are entitled to summary judgment because Fidelity's claims are untimely. The Illinois Uniform Fraudulent Transfer Act (UFTA) requires plaintiffs to file claims within four years after the transfer was made or, if later, "within one year after the transfer or obligation was or could reasonably have been discovered by the claimant." 740 ILCS 160/10(a); *see also Gilbert Bros., Inc. v. Gilbert*, 258 Ill.App.3d 395, 400, 630 N.E.2d 189,193 (1994). The Defendant Banks argue that the statute of limitations began to run no later than December 21, 2000, when Fidelity's counsel interviewed Stimac and Stimac informed counsel that escrow funds were used by the Intercounty insiders to purchase certificates of deposit that were pledged for the personal use of insiders. Fidelity argues that the limitations period did not begin to run until February 2001, when it learned through the use of subpoena which banks received allegedly fraudulent transfers. Although the application of the discovery rule usually is an issue of fact, it can be resolved on a motion for summary judgment where the material facts are undisputed and there is only one inference that can be drawn from them. *Cathedral of Joy Baptist Church v. Village of Hazel Crest*, 22 F.3d 713, 719 (7th Cir. 1994).

The Illinois UFTA incorporates the discovery rule into its statute of limitations. The discovery rule postpones the running of the statute of limitations until a party knew or should have known his injury was wrongfully caused. *Knox College v. Celotex Corp.*, 88 Ill.

23

2d 407, 414, 430 N.E. 2d 976, 979 (1981). Under the discovery rule, the event that triggers the running of the statute of limitations is neither the first knowledge a person has about his injury, nor the acquisition of the knowledge that one has a cause of action against another. *Id.* at 414, 430 N.E. at 980. In other words, the discovery rule does not toll the statute until the plaintiff learns of defendants' wrongful conduct. *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill. 2d 72, 85, 651 N.E. 2d 1132, 1139 (1995) (citing *Nolan v. Johns-Manville Asbestos*, 85 Ill.2d 161, 170-71, 421 N.E.2d 864 (1981)). Thus, the limitations period begins to run when the plaintiff knows his injury is wrongfully caused, not when he realizes he has a cause of action against a particular defendant. *McCormick v. Uppuluri*, 250 Ill.App.3d 386, 621 N.E. 2d 57 (1993); *Wells v. Travis*, 284 Ill.App.3d 282, 672 N.E. 2d 789 (1996). In the context of the Illinois UFTA, the statute of limitations begins to run when a plaintiff "should have reasonably known that a possible cause of action may have existed for fraudulent transfer of funds and . . . should have investigated further." *Gilbert Bros., Inc.*, 258 Ill. App. 3d at 400, 630 N.E.2d at 192.

The Banks argue that *Gilbert Brothers* stands for the proposition that the statute of limitations began to run when Fidelity should have reasonably known that a possible cause of action for fraudulent transfer may have existed and should have begun an investigation into that cause of action. Fidelity, on the other hand, argues that the statute of limitations should not begin to run until it had completed its investigation into the certificates of deposit and knew for certain which banks received fraudulent transfers. Fidelity further suggests that its position is the law of the case, pointing to the Court's ruling on the Banks'

motions to dismiss. *See Fidelity Nat'l Title Ins. Co. v. Howard Sav. Bank*, 02 C 643 (Feb. 10, 2003 Memorandum Opinion and Order).

But Fidelity misreads the Court's February opinion on the motions to dismiss. In those motions, the Court was not asked to determine whether the statute of limitations began to run either when Fidelity first learned it had potential claims for fraudulent transfers or when it completed its investigation into which banks might have received fraudulent transfers. Instead, the question before the Court on the motions to dismiss was whether the statute of limitations began to run when Fidelity learned of the escrow deficiency created by the Intercounty insiders. In their motions to dismiss, the Defendant Banks argued that the statute of limitations began to run in Spring 2000, when Fidelity learned of Intercounty's escrow deficiency and suspected that the deficiency, because of its size, was wrongfully caused. *See id.* at 4. The Court noted that the Defendant Banks had "confuse[d] the injury Fidelity suffered from Capriotti's and Hargrove's scheme to siphon funds from the escrow accounts with the injury Fidelity suffered from the fraudulent transfers committed to conduct that scheme." *Id.* Thus, the Court held that Fidelity's knowledge that the escrow accounts had been depleted did not put it on notice that fraudulent transfers might have occurred.

Furthermore in resolving the motions to dismiss, the Court accepted Fidelity's well-pleaded factual assertions as true. Although a limitations issue can be raised on a motion to dismiss, it can succeed only if the allegations in the complaint demonstrate that nothing the plaintiff can prove would bring the claim within the statute. *Curry v. A.H. Robbins*, 775

F.2d 212, 217 (7th Cir. 1985); *Sparano v. Southland Corp.*, No. 94 C 2098, 1995 WL 470267, at * 9 (N.D. Ill. Aug. 4, 1995). Fidelity pleaded that because of Capriotti's and Hargrove's coverups, it could not have discovered its cause of action until February 2001. On summary judgment, Fidelity is not entitled to the presumption that all well-pleaded facts are true, the factual record before the Court now is more developed, and consequently the Court must revisit the issue of whether Fidelity has timely filed its suit. *See Curran v. Kwon*, 153 F.3d 481, 487 (7th Cir. 1998) (law of the case not applicable when the Court is presented with additional evidence calling into question the original ruling).

*Gilbert Brothers* makes clear that the statute of limitations begins to run *prior* to the time when the injured party acquires "the knowledge that [it] has a cause of action against another." *Gilbert Bros., Inc.*, 630 N.E. 2d at 192 (citing *Knox College*, 88 Ill. 2d at 415). The statute of limitations can begin to run even if a plaintiff does not know the full extent of the injury or is not certain that a cause of action lies against a *particular* defendant. *Hoffman v. Orthopedic Serv.*, 327 Ill. App. 3d 1004, 1010; 765 N.E.d2d 116, 121-122 (2002); *McCormick*, 621 N.E. 2d 57. Accordingly, *Gilbert Brothers* marks the significant point, for statute of limitations purposes, as the time at which a party is put on notice of a possible claim, triggering a duty to make a diligent inquiry into whether a cause of action lies. *Gilbert Bros., Inc.*, 630 N.E. 2d at 192; *see also Knox College*, 88 Ill. 2d at 415-416, 430 N.E.2d at 980. In other words, the statute of limitations begins to run when a plaintiff is under an obligation to begin an investigation, not (as Fidelity suggests) when Plaintiff completes that investigation. The Court holds that in this case the statute of limitations began to run when

Fidelity should have known that it had a possible cause of action for fraudulent transfer and should have begun an investigation into whether such a cause of action lies against the Defendant Banks. Here that date is no later than December 21, 2000.

The undisputed facts establish that on December 21, 2000, Fidelity knew that: (1) IRS Agent Lischka, who was investigating Intercounty insiders' wrongdoing, had asked Pollard on December 8 to provide evidence or documentation related to certificates of deposit purchased with escrow funds; (2) Intercounty insiders had converted funds at Banco Popular through the purchase, pledge and liquidation of a certificate of deposit; and (3) Intercounty's former controller believed that Intercounty insiders had used escrow funds to purchase certificates of deposit, which were then pledged as collateral for personal loans. Over the next few weeks (and before January 25, 2001 — the date one year prior to the date Fidelity filed these suits), Fidelity responded to this information by: (1) requesting Deloitte to produce a list of "potentially suspicious" bank transactions; (2) serving numerous banks with subpoenas in connection with certificates of deposit purchased with escrow funds; and (3) sending the IRS a letter that included a list of banks where Intercounty Title Company held certificates of deposit. Furthermore, on January 22, 2001, Fidelity's counsel wrote a memorandum regarding the certificates of deposit and their misuse, stating that "[a]t the high water mark for this practice, Stimac said that Intercounty had invested $7-8 million in CDs. Stimac understands (apparently through office scuttlebutt) that these CDs were sometimes pledged for personal use."

The only reasonable inference that can be drawn from these undisputed facts is that Fidelity had sufficient knowledge by December 21, 2000 to put it on notice that it had a possible claim for fraudulent transfers and obligate it to investigate that claim, which Fidelity, in fact, did over the next two months. Under *Gilbert Brothers*, the statute of limitations thus began to run on December 21, 2000, when Fidelity had an obligation to investigate whether the cause of action for fraudulent transfers lies. 630 N.E. 2d at 192. Stimac suggested to them that Intercounty insiders were pledging certificates of deposit purchased with escrow funds as collateral for personal loans. Fidelity had some corroborating evidence to bolster Stimac's suspicion: (1) it knew that the IRS (which was also investigating the Intercounty fraud) had an interest in certificates of deposit and (2) it knew that Intercounty insiders had used a certificate of deposit that had served as INTIC's statutory bond as collateral to obtain personal loans from Banco Popular. These facts triggered a duty on Fidelity to investigate whether the Intercounty insiders fraudulently transferred escrow assets to the banks using certificates of deposit purchased with escrow funds to obtain personal loans. And in fact, Fidelity did begin such an investigation. In the three weeks following Stimac's revelation, Fidelity responded by : (1) requesting that Deloitte and Touche produce a list of banks that might have received fraudulent transfers; (2) issuing subpoenas to these banks to obtain records of the transfers that it could not locate in Intercounty's files; and (3) scrutinizing Old and New Intercounty's escrow reconciliations. By January 22, 2001, Fidelity's counsel prepared a memorandum explaining the results of the investigation to that point (among other things)

and asserting the belief that Intercounty insiders had used certificates of deposit to convert escrow funds to their personal use. Thus, not only was Fidelity put on notice that it should begin an investigation into claims for fraudulent transfer — but it actually did begin such an investigation.

Fidelity argues that Stimac's interview was mere "office scuttlebutt" and only created a suspicion that its injury had been wrongfully caused. It is true that the statute of limitations period is not triggered during the period that a party is attempting to discover whether an injury was wrongfully caused. *Young v. McKiegue*, 303 Ill. App. 3d 380, 390, 708 N.E. 2d 493, 501 (1999). But as explained earlier, the IRS's interest in certificates of deposit and the Banco Popular lawsuit provided some corroboration of Stimac's suspicions.

Fidelity also argues that until February 2001 it did not know which banks were duped by the Intercounty agents and thus it only had a suspicion that its injuries were wrongfully caused. But here Fidelity confuses its investigation into *who* caused the wrongful injury with the investigation into *whether* the injury was wrongfully caused. In April 2000, Fidelity knew that it had been injured: New Intercounty had enormous escrow deficiencies and it had been joined on insured closing letters. At this point Fidelity had only a mere suspicion that the injury was wrongfully caused, but because of the size of the deficiency it believed there might have been some foul play involved. Thus (as the Court held on the motions to dismiss) the statute of limitations did not begin to run when Fidelity learned of the initial injury. At that point, Fidelity's initial investigative efforts focused on determining the size of the deficiency and on locating any assets it could use to offset it.

But by September 2000, Fidelity's agent, Pollard, wrote that Capriotti and Hargrove had "systematically stolen" from Old and New Intercounty's escrow accounts. In September 2000 Fidelity thus knew its injury had been wrongfully caused — but because of the vastness of the scheme and the manner in which it had been covered up, Fidelity still had no idea that it could have been caused by fraudulent transfers. And so the statute of limitations for these claims could not yet begin to run (as opposed to its claims verses the Intercounty insiders). But by December 2000, Fidelity had reason to believe that one way in which the injury had been wrongfully caused had been through Hargrove's and Capriotti's use of certificates of deposit. In December 2000, Fidelity began an investigation into precisely which certificates of deposit were used in the Intercounty insiders' scheme. In other words, by December 2000, Fidelity knew that it had been wrongfully injured; it just didn't know which Banks were involved (albeit passively) in the insiders' scheme. As noted earlier, a plaintiff need not know that a cause of action lies against a *particular* defendant in order to trigger the limitations period. *McCormick*, 621 N.E. 2d at 58-59. Instead, Fidelity need to have known only that its injury was wrongfully caused to trigger the running of the statute of limitations.

Fidelity makes numerous other arguments to extend the period in which it could file, none of which are convincing. It argues that the liquidation of the certificates of deposit was concealed even from employees of Old Intercounty. The facts in the record demonstrate that several Old Intercounty officials were unaware of Capriotti's and Hargrove's scheme. However, the fact that Old Intercounty officials were unaware of the

scheme is irrelevant to the inquiry presented here. The fact that Capriotti and Hargrove concealed their scheme from other Intercounty employees demonstrates nothing about when Fidelity learned its injury had been wrongfully caused; it only demonstrates that Fidelity could not have learned of the scheme while it was ongoing. But the Defendant Banks do not argue that the discovery rule should not apply at all (otherwise the statutes of limitations, for the most part, would have ran during the mid-nineties, four years after most of the certificates were pledged). Fidelity also argues that equitable estoppel should toll the statute of limitations. Fidelity argues that Intercounty's records were a mess, that insiders threatened them during its investigation, that the United States' investigation interfered with its own. Perhaps if Fidelity's investigation was so hindered by the shenanigans of Intercounty insiders that it could not have learned the identity of the banks involved in the scheme until after December 2001, an argument for equitable estoppel could be made. But the fact remains that Fidelity knew with certainty which Banks it believed to have been involved with the insiders scheme by February 2001 — leaving them ten months (out of twelve) in the limitations period to press its claims. It had more than sufficient time to draft a complaint. It simply chose to wait.

Unfortunately, Fidelity waited too long. The Illinois UFTA allows plaintiffs one year after the discovery of the fraudulent transfer to file their lawsuits. The Court finds that the statute of limitations began to run on December 21, 2000. Fidelity filed this suit on January 25, 2002. It is therefore untimely.

Defendants' motions for summary judgment are GRANTED. Fidelity's motion for summary judgment is DENIED. Defendants' motion to strike Pollard's report is DENIED. Fidelity's motion for sanctions against certain banks is DENIED. Any and all other pending motions are DENIED as moot.

IT IS SO ORDERED.

_9/17/06_
Dated

The Honorable William J. Hibbler
United States District Court